Oppenheimer, Appellant, *v.* Sterling Drug, Inc., Appellee.

[Cite as Oppenheimer v. Sterling Drug, Inc., 7 Ohio App. 2d 103.]

(No. 7624—Decided December 29, 1964.)

*Mr. Edward F. Lynch* and *Messrs. Feibel, Feibel & Golden,* for appellant.

*Messrs. Lane, Huggard & Alton,* for appellee.

TROOP, J. This appeal is from a judgment and final order of the Court of Common Pleas of Franklin County on questions of law. The plaintiff in the trial court, Faye Oppenheimer, is the appellant here, and the defendant, Sterling Drug, Inc., is the appellee. Reference is to plaintiff and defendant as they were in the trial court.

Plaintiff consulted Dr. James McCreary concerning a skin disorder on December 4, 1957. On or about May 19, 1958, plaintiff was subjected to a biopsy, following which the laboratory reported "skin changes compatible with but not diagnostic of lupus erythematosus." Upon or shortly after receiving the laboratory report, Dr. McCreary prescribed "Chloroquine, 250 milligrams twice daily." Chloroquine is a prescription medicine prepared and distributed by the defendant, under the trade name of Aralen, through its subsidiary Winthrop Laboratories.

Under date of May 23, 1958, the Eastmoor Pharmacy filled a prescription, numbered 79742, for fifty Aralen tablets, for the plaintiff, as directed by Dr. McCreary. It appears from the prescription form and testimony of the pharmacist that the direction to supply the Aralen tablets had been called over the telephone by the doctor. The legend on the prescription indicates that the prescription was refillable for six months from the date of the original prescription. The prescription was refilled periodically over a period of more than two years, according to the records of the pharmacy. The prescription was filled the last time on October 18, 1960. Although the prescription was refilled about twenty times, and far beyond the refillable limit of six months, the records of the pharmacy and the testimony of the pharmacist do not show any renewal of the order of Dr. McCreary, either written or by telephone communication.

On October 24, 1960, plaintiff visited Dr. William Havener, an ophthalmologist, after having consulted with three other such specialists, and expressed to him the fear that she would soon be blind. Plaintiff revealed to the doctor the fact of her skin disorder, lupus discoid erythematosus, and that she had been treated for the disorder, cortisal steroids and Chloroquine having been prescribed. Dr. Havener recommended the discontinuance of the use of Chloroquine. As of February 10, 1961, Dr. Havener found the plaintiff to have a marked loss in her field

of vision and diagnosed the cause as chloroquine retinopathy.

Briefly stated, this is the background for the filing of the second amended petition of the plaintiff in the trial court in which she alleges that the product of the defendant, Aralen or Chloroquine Phosphate, was a harmful product, although distributed as an effective safe treatment for chronic discoid lupus erythematosus, and was the cause of the damage to and loss of vision in her eyes. She further alleges that she relied on the statements of the defendant, purchased the drug at a local drug store, and used the drug as prescribed. Further, plaintiff alleges that by reason of the negligence of the defendant in selling the harmful product, in failing to discover the defects in the preparation, and in failing to warn the plaintiff of its harmful effects, it is the cause of her loss of vision and permanent damage to her eyes. It is claimed also that defendant breached its express warranty and that there was an implied warranty of fitness for use which ran with the product from the defendant to the consumer, plaintiff in the instant case.

Defendant filed its second amended answer to plaintiff's second amended petition entering a general denial, claiming contributory negligence on the part of the plaintiff and assumption of risk, as well as special defenses not involved in this discussion. The issues thus made up, the case was tried to a jury, but at the close of all the evidence the trial court sustained defendant's motion for a directed verdict and ordered the jury to return its verdict favorable to the defendant. This was done, and judgment entered accordingly. A motion for a new trial was overruled. This appeal was taken from that judgment and final order.

There are four errors assigned as the basis upon which this appeal is predicated. Those indicated as three and four are perfunctory, dealing with errors manifest on the face of the record and the overruling of plaintiff's motion for a new trial. The errors delineated one and two deal with the nub of plaintiff's contention, which is that the court erred in taking the case from the jury at the close of all the evidence and in directing a verdict for the defendant.

The rule in Ohio concerning the propriety of a directed verdict is well set. It is clearly stated in 52 Ohio Jurisprudence 2d 618, Section 121, as follows:

"* * * upon a motion to direct a verdict, [if] the trial court, after construing the evidence most strongly in favor of the person against whom the motion is directed, finds that upon any essential issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, it should direct a verdict against him, and not allow the jury to speculate upon the question; but if reasonable minds may reasonably reach different conclusions, or draw different inferences, upon any questions of fact, the motion should be denied and the case submitted to the jury. * * *"

The essential issues as determined from the pleadings and the evidence are essentially as follows:

1. The negligence of the defendant, and

2. The contributory negligence of the plaintiff.

3. The possible intervening causes of the injury to the the plaintiff, as well as

4. A breach of an express warranty, or

5. A possible implied warranty moving from defendant to plaintiff.

It should be noted, in considering the matter of the negligence of the defendant, that the drug in question is basically a good medicine and in no sense a dangerous drug. The standard to be applied to the conduct of the defendant is, therefore, that of ordinary care. Aralen was developed as a treatment for malaria and became, and still is, an effective and harmless treatment for malaria when used as directed. However, after its introduction, other uses were found. These clinical uses of the preparation Aralen, or Chloroquine Phosphate, began with doctors who reported the results of its use in the medical literature of the United States and England beginning in 1950-51. In 1955, the defendant published a pamphlet entitled "Discoid Lupus Erythematosus" following fairly extended clinical use of Aralen by dermatologists and other specialists who reported to the defendant. The dosage and technical requirements were cleared with the federal Food and Drug Administration. The first pamphlet (plaintiff's exhibit No. 3), 1955, did not contain any warnings as to possible side effects.

In 1957, the defendant applied to the Food and Drug Administration for a new authority for the use of Aralen. All the then known side effects were reported to that governmen-

tal department. Additional side effects, particularly visual disturbances and corneal deposits reported in the medical literature, were relayed to the Food and Drug Administration. The first piece of literature, put out by defendant, which included reference to "visual disturbances" as a side effect appeared in July 1959. The piece of literature, circulated to doctors and the drug trade generally, contained a section entitled "Side Effects," one of which listed effects being "visual disturbances."

Among the exhibits, entered in evidence in the case before us, are several copies of Physicians' Desk Reference circulated among doctors and intended to provide ready information concerning drugs, their composition, use, dosage, and side effects. Plaintiff's exhibit No. 5 is the 1958 Edition. At page 834, "Aralen Phosphate" is listed. The article reads in part as follows:

"Side Effects: Headache, visual disturbances, pruritus, skin rashes, leukopenia, gastro-intestinal complaints. Often transient, or subside on withdrawal or reduction of dosage."

Essentially the same language appears in the issues of Physicians' Desk Reference in subsequent years.

Warnings concerning possible ill effects from the use of Aralen by way of visual disturbances appear in July 1959 and in the 1958 Edition of Physicians' Desk Reference. It is noted that the use of Aralen by the plaintiff began in May of 1958, at which time the Physicians' Desk Reference Edition of 1958 was available and the warning word clearly set forth.

That the defendant did what was reasonably proper in view of all the phases of the use of the drug, taking into account its usefulness as well as its possible unfavorable effects, by advising the medical and drug world concerning it, is well emphasized by the testimony of Dr. Havener, plaintiff's own witness. He said that "every medicine which we use can have poisonous effects." And he added approval for the use of Aralen, as follows:

"I believe today chloroquine is one of the drugs of choice for the treatment of malaria, rheumatoid arthritis and discoid erythematosus."

Dr. Havener qualifiedly approved the content of an article published in the Archives of Dermatology No. 88, extolling the virtues of Chloroquine as a useful drug, "and with the exception of rare and heretofore unpreventable cases of retinopathy,

reasonably safe drug." And then the doctor on his own said— "If the patient has a sufficiently severe disease, yes, then it would be a great pity if an effective drug were withheld."

It is difficult to find in the voluminous record any suggestion that the defendant did, or failed to do, what was reasonable and proper in the light of all the circumstances present. Its was the conduct of reasonable men under the same or similar circumstances. The defendant was not, therefore, negligent as to this particular plaintiff.

Even assuming negligence on the part of the defendant, it is impossible to find that its negligence is the proximate cause of the injury suffered by the plaintiff. Three other factors enter the treatment picture of the plaintiff, her doctor, the plaintiff herself, and the druggist. In the record before us, there is nothing to indicate that the doctor relied upon any information furnished by the defendant in prescribing Aralen for his patient, the plaintiff herein, even though he did say that he relied upon Physicians' Desk Reference and drug company literature. The doctor later specifically said—"I don't recall specifically reading the precautions"—when referring to plaintiff's exhibit No. 3. He said, further, that he did not know it, Aralen, to be a prescription drug, and that in the use of it he relied upon his own experience and what he had learned at the meetings.

Asked concerning the dosage he had prescribed, that is, one tablet and then two tablets on alternate days, and the source of his information, he replied—"I cannot. I do not know except we were just trying to get her cleared up and the best way we could. There is no source of information on that dosage."

It is significant that on July 5, 1958, the doctor discontinued the Chloroquine as treatment for his patient, only to have her back in his office on July 23 exhibiting red spots on her cheeks. At that call the doctor noted—"she wished to try Aralen one a day; that would be 250 milligrams." And then he added, "I permitted that." On September 17 the dosage was changed to the one and two a day on alternate days. When asked on cross-examination what he told his patient to do when she asked to try Aralen on a one-a-day basis, the doctor said, "Well, my notes say, well—call if she gets a reaction." Incidentally, nothing in the record indicates that the patient ever called to report any reaction.

In the testimony of Dr. Edward Okrum we find observations concerning the individual responsibilities of doctor, patient and druggist. He said that it is the doctor's business to evaluate his patient as to type of drug, the amount to be prescribed and the length of time prescribed for its use; the druggist's business is to fill the prescription accurately and observe the time limitations; and the patient's business is to report back to her doctor if she observes any side effects.

There was only one prescription issued in the case before us, and that was called in on May 23, 1958. Legally or illegally, the prescription was refilled approximately twenty times over a period of almost two and one-half years, although the prescription carried a limit of six months, and neither doctor nor druggist could recall or produce a record authorizing any renewal. During the period of refilling the prescription, May 23, 1958, to October 18, 1960, there was an extended period of time that the plaintiff was completely out of touch with her attending physician. The period was from July 20, 1959, to November 1 or 7, 1960, a year and three months. On July 20, the patient complained of sunburn, but the doctor's record notes "plaquenils should be continued." Concerning this note the doctor said, "I think that was a mistake on my part. I thought she was on plaquenil." It was not until November 1 (or 7), 1960, that the doctor notes concerning his patient—"has eye signs and symptoms which has been thought to be due to drugs."

Plaintiff's doctor failed to observe the warnings set out in Physicians' Desk Reference, if he ever saw them. His recollection was not clear as to the readings in Physicians' Desk Reference and defendant's literature circulated to physicians and druggists. It can hardly be said that he relied upon anything produced by the defendant or found in the general literature. The plaintiff secured the refills of her prescription beyond its time limit entirely on her own, having elected to use Aralen as a treatment for her skin disease. The druggist refilled her prescription without authorization and far beyond the time limit contained in the first prescription. Plaintiff's exhibit No. 10-X, a small box in which the bottle containing the pills was sold, carries this legend:

"Caution; Federal law prohibits dispensing without prescription.

"Usual dose 1 or 2 tablets."

That box was in the plaintiff's own hands when she purchased Aralen. All these things can as well be said to have caused the injury to plaintiff of which she complains as any possible negligence of the defendant, if there should be such.

There can be no breach of warranty in the case before us. In the case of *Rogers* v. *Toni Home Permanent Co.* (1958), 167 Ohio St. 244, we find this definitive language, as follows:

"2. An express warranty is an affirmation of fact by the seller as to a product or commodity to induce the purchase thereof, on which affirmation the buyer relies in making the purchase."

The record fails to disclose any reliance by the plaintiff upon anything published or said by the defendant. Even if the defendant had failed in its duty to the plaintiff by reason of any erroneous publication, the record is completely silent as to any reliance upon the part of the plaintiff, and, for that matter, on the part of her doctor. It cannot, therefore, be said that there was a breach of warranty, either express or implied, as to this plaintiff.

Examination of the record fails to reveal any error prejudicial to the plaintiff herein. Reasonable minds could come to but one conclusion as to the intervening causal position of doctor and druggist and as to the contributory negligence of the plaintiff herself. The defendant was not negligent toward this plaintiff; but assuming it were, the doctor, druggist and plaintiff provide the cause of the injuries of which plaintiff complains. The judgment of the trial court is, therefore, affirmed.

The appeal having been submitted upon its merits, the motions pending before this court are moot and are, therefore, overruled.

*Judgment affirmed.*

BRYANT, J. (Presiding), and DUFFEY, J., concur.