**Bonita J. MAMPE, Appellant,**

v.

**AYERST LABORATORIES, Appellee.**

No. 87–678.

District of Columbia Court of Appeals.

Argued June 8, 1988.

Decided Oct. 14, 1988.

---

W. David Allen, with whom Allen T. Eaton and David T. Smorodin, Washington, D.C., were on brief, for appellant.

Bruce M. Chadwick, with whom Peter K. Bleakley, Washington, D.C., was on brief, for appellee.

Before BELSON, TERRY, and SCHWELB, Associate Judges.

TERRY, Associate Judge:

Appellant Mampe sued Ayerst Laboratories ("Ayerst"), a division of American Home Products Corporation, for injuries allegedly arising from her use of Antabuse, a prescription drug administered to her as part of her therapy for alcohol abuse. Mrs. Mampe claimed that Ayerst had marketed the drug with inadequate warnings which misrepresented the severity of its possible adverse effects. The trial court granted Ayerst's motion for summary judgment without a hearing. Mampe appeals from that ruling, contending that she raised material issues of fact as to whether Ayerst's warnings were adequate and whether her physician had relied on those warnings in prescribing Antabuse for her treatment. Mampe also challenges a protective order limiting the scope of discovery and her use of information obtained through discovery, and a separate order denying her motion to compel Ayerst to produce certain confidential documents. We hold that even if the warnings were

inadequate (an issue which we do not decide), summary judgment was properly granted to Ayerst because the record conclusively shows that the alleged inadequacy of the warnings did not affect one way or the other the decision of Mrs. Mampe's physician to prescribe Antabuse for her treatment. We therefore affirm the judgment. Any issue arising from the denial of the motion to compel discovery is thus made moot. With respect to the protective order, which remains in effect notwithstanding our affirmance of the judgment, we remand the case to the trial court for further proceedings.

# I

Antabuse is a prescription drug used in the treatment of alcoholism. It contains as its active agent a compound known as disulfiram, which produces an extremely unpleasant and potentially dangerous reaction with alcohol, thereby serving as a powerful deterrent to those using Antabuse from drinking any alcohol. PHYSICIAN'S DESK REFERENCE 632 (41st ed. 1987) ("PDR"). Antabuse is not sold over the counter but is available only on prescription from a licensed physician. In its product insert for the medical community, Ayerst describes in detail the Antabuse-alcohol reaction and warns of the possible adverse reactions which some patients may have to the drug. The PDR contains precisely the same information and warning. Id. at Foreword, 633; see 21 C.F.R. § 201.100(d)(1) (1988).[1]

In March 1982, Dr. John V. Wylie, a psychiatrist, prescribed Antabuse for his patient, Bonita Mampe, as part of her therapy for alcohol abuse. The drug apparently had no immediate effect on Mrs. Mampe, who continued to consume alcohol from time to time. In the latter part of May, however, Mrs. Mampe suffered a physical collapse and was taken to Georgetown University Hospital in critical condition. She remained there for a month and then was transferred to Sibley Memorial Hospital, where she stayed for two more months.[2]

At the time of her admission to Georgetown Hospital, Mrs. Mampe was suffering from paralysis, and her speech and voice were impaired. She was diagnosed by Dr. Wylie as suffering "neurological sequelae of Antabuse-alcohol interaction."[3] Another doctor described her condition as "severe encephalopathy,"[4] characterized by "confused scraps of conversation [with] underlying depressive effect." Dr. Wylie concluded that Mrs. Mampe was suffering from organic brain syndrome.

Some time after her release from the hospital, Mrs. Mampe sued Ayerst Laboratories, the maker of Antabuse, alleging that Ayerst had marketed and promoted a defective product in that its labels, product inserts, and promotional materials failed to give adequate warning of the severe medical complications which could arise from her use of the drug. Asserting both negligence and strict liability, she stated in her complaint that she "has in the past suffered, continues to suffer, and will in the

---

1. Both the product insert for Antabuse and the PDR contain the following warning in capital letters under the heading "ADVERSE REACTIONS":

   OPTIC NEURITIS, PERIPHERAL NEURITIS, AND POLYNEURITIS MAY OCCUR FOLLOWING ADMINISTRATION OF ANTABUSE. The same sources also describe the "ANTABUSE–ALCOHOL REACTION" as follows:
   ANTABUSE plus alcohol, even small amounts, produces flushing, throbbing in head and neck, throbbing headache, respiratory difficulty, nausea, copious vomiting, sweating, thirst, chest pain, palpitation, dyspnea, hyperventilation, tachycardia, hypotension, syncope, marked uneasiness, weakness, vertigo, blurred vision, and confusion. In severe reactions there may be respiratory depression,

cardiovascular collapse, arrhythmias, myocardial infarction, acute congestive heart failure, unconsciousness, convulsions, *and death.* [Emphasis added.]

2. Mrs. Mampe had previously been a patient at Sibley Hospital in April 1982, where Dr. Wylie's treatment for her included Antabuse and lithium.

3. A standard reference work defines "sequela" (the singular of "sequelae") as "any lesion or affection following or caused by an attack of disease." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1191 (26th ed. 1981).

4. "Encephalopathy" is defined as "any degenerative disease of the brain." Id. at 438.

future suffer" neurological damage from her initial collapse and prolonged hospitalization.[5]

During the discovery phase of the litigation, Mampe requested Ayerst to produce information about Antabuse and its testing dating back to 1975. When Ayerst objected to most of these requests as overbroad, Mampe filed a motion to compel production of documents under Super.Ct.Civ.R. 37. The trial court denied the motion, limiting both the dates and the subject matter of the documents Ayerst would have to produce. Ayerst also sought a protective order which would limit Mampe's use of its confidential documents to the present litigation and require reimbursement from Mampe for the costs of their production. The court granted this request, allowing Ayerst to mark as confidential any documents it considered to be confidential, and limiting the use of such documents to this case only. In addition, the court ordered Mampe to pay six cents a page for copies and to return the confidential documents or certify their destruction upon conclusion of this litigation. The record does not disclose the court's reasons for any of these rulings.

After discovery had been completed, Ayerst moved for summary judgment on all of Mampe's claims, arguing that the warnings were adequate as a matter of law and that, in any event, Dr. Wylie did not rely on them, so that any alleged inadequacy in the warnings could not have been the proximate cause of Mampe's injuries. The trial court granted the motion and, following Mrs. Mampe's settlement with Dr. Wylie, dismissed the entire case with prejudice.

## II

Mrs. Mampe argues that in responding to Ayerst's motion for summary judgment, she raised material issues of fact as to whether Ayerst, in its marketing and promotion of Antabuse, failed to warn her prescribing physician, Dr. Wylie, of the se-

vere neurological damage associated with the drug, and whether Dr. Wylie relied on these warnings. Her evidence on the first point consists largely of the deposition testimony of two experts who conclude that the warnings are understated and misleading, and that they fail to apprise physicians of the specific adverse reactions to the drug which Mrs. Mampe claims to have suffered or of the severity of those reactions. In response Ayerst maintains that the warnings are adequate as a matter of law, in that the descriptions of "Adverse Reactions" and "Antabuse–Alcohol Reaction" (see note 1, *supra*) encompass all the injuries which Mrs. Mampe claims to have suffered. In addition, Ayerst argues that Mrs. Mampe has failed to show that proper warnings (assuming that the existing warnings are insufficient) would have had any effect on Dr. Wylie's decision to prescribe Antabuse.

We seriously doubt that promotional materials which warn of death as a possible reaction to a drug could be inadequate to warn of a consequence any less severe. We need not decide the issue of adequacy, however, because we agree with Ayerst's second contention that, even if the warnings were inadequate, they could not have caused Mrs. Mampe's injuries because Dr. Wylie did not rely on them.

## III

To succeed in her claim against Ayerst, Mrs. Mampe must show that some act or omission by Ayerst proximately caused her injuries. On the issue of causation in inadequate labeling cases, case law in the District of Columbia recognizes a rebuttable presumption "that the user"—in this case, the prescribing physician— "would have read an adequate warning, and that in the absence of evidence rebutting the presumption, a jury may find that the defendant's product was the producing cause of the plaintiff's injury." *Payne v. Soft Sheen Products, Inc.,* 486 A.2d 712,

---

**5.** Appellant also sued Dr. Wylie, Sibley Hospital, and the drug store which had dispensed the Antabuse on Dr. Wylie's prescription. She subsequently dismissed with prejudice her claims

against the hospital and the drug store, and thereafter she entered into a settlement with Dr. Wylie. Neither Dr. Wylie, the hospital, nor the drug store is a party to this appeal.

725 (D.C.1985) (citations omitted).[6] But that presumption does not determine the outcome of this case. We need not decide whether Dr. Wylie's deposition testimony was sufficient to rebut the presumption.[7] Rather, we hold that the chain of causation was broken by Ayerst's unrebutted showing that, regardless of what Dr. Wylie may have read or not read, the alleged inadequacy of the warning label had no effect on his decision to prescribe Antabuse for Mrs. Mampe.

Dr. Wylie, in his deposition, specifically stated on several occasions that he did not rely on the manufacturer's warnings as a source of information about the possible adverse reactions to Antabuse. Rather, he acquired his knowledge from "a variety of different kinds of communications," including medical journals, lectures, and personal contact with his peers. Read as a whole, Dr. Wylie's testimony establishes beyond dispute that his decision to prescribe Antabuse for Mrs. Mampe would not have been affected in the least by the communication of an adequate warning (assuming that Ayerst's warning was inadequate). Mrs. Mampe therefore could not prove that the alleged inadequacy in Ayerst's warning was a proximate cause of her injuries, and the trial court was correct in granting summary judgment for Ayerst. *See Stanback v. Parke, Davis & Co.,* 657 F.2d 642, 645–646 (4th. Cir.1981); *Chambers v. G.D. Searle & Co.,* 441 F.Supp. 377, 382 (D.Md.

1975), *aff'd,* 567 F.2d 269 (4th Cir.1977); *Oppenheimer v. Sterling Drug, Inc.,* 7 Ohio App.2d 103, 109, 219 N.E.2d 54, 58–59 (1964); *Douglas v. Bussabarger,* 73 Wash. 2d 476, 477–478, 438 P.2d 829, 831 (1968).[8]

Mampe argues that she has at least raised a factual issue as to the state of Dr. Wylie's knowledge and the sources from which he might have received information about Antabuse. *See Ferebee v. Chevron Chemical Co.,* 237 U.S.App.D.C. 164, 173–174, 736 F.2d 1529, 1538–1539, *cert. denied,* 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984); *Stanton ex rel. Brooks v. Astra Pharmaceutical Products, Inc.,* 718 F.2d 553, 567 (3d Cir.1983). To support this argument, she refers to Dr. Wylie's deposition testimony that he might have relied on Ayerst's product insert "perhaps to a small degree" as a source of information about Antabuse, and his answers to interrogatories in which he stated that he generally consulted the PDR, which in this instance contained Ayerst's (allegedly inadequate) product information.

▇▇▇ On appeal from any order granting a motion for summary judgment, this court must view the record in the light most favorable to the party opposing the motion, and must resolve against the movant any doubt as to the existence of a factual dispute. *E.g., Swann v. Waldman,* 465 A.2d 844, 846 (D.C.1983) (citing cases). What this means in the instant case is that

---

6. When the purchase of the product is recommended or prescribed "by an intermediary who is a professional, the adequacy of the instructions must be judged in relationship to that professional." *Payne v. Soft Sheen Products, Inc., supra,* 486 A.2d at 722 n. 10 (citations omitted).

7. The trial court, in its order granting summary judgment for Ayerst, cited an unpublished opinion from the United States District Court for the District of Columbia, *Conafay v. Wyeth Laboratories,* No. 83–0637 (D.D.C. March 19, 1985). In that case, which was very similar to the instant case on its facts, the District Court granted summary judgment for the manufacturers of a vaccine which had caused injuries to a patient. On appeal from that judgment, the Court of Appeals described the manufacturer's motion as follows:

The gist of the summary judgment motion was that Dr. Ong had testified in his deposition that when he decided to vaccinate Casey

[the patient] he was fully aware of the contraindications and attendant risks of the use of DPT vaccine *and thus that plaintiffs could not show that inadequate warnings from Wyeth caused the injury to Casey.*
*Conafay v. Wyeth Laboratories,* 253 U.S.App.D.C. 279, 280, 793 F.2d 350, 351 (1986) (emphasis added). The Court of Appeals neither affirmed nor reversed the District Court's rulings on Wyeth's motion for summary judgment, choosing instead (with one judge dissenting) to remand the case for further proceedings with respect to another motion. We have no information about the proceedings on remand or the ultimate disposition of the case.

8. *See also Mulder v. Parke, Davis & Co.,* 288 Minn. 332, 335–336, 181 N.W.2d 882, 885 (1970). *But see Sterling Drug, Inc. v. Yarrow,* 408 F.2d 978, 994 (8th Cir.1969); *Richards v. Upjohn Co.,* 95 N.M. 675, 680, 625 P.2d 1192, 1197 (N.M.Ct. App.), *cert. denied,* 94 N.M. 675, 615 P.2d 992 (1980).

Dr. Wylie's admission that he might have relied on the product insert "perhaps to a small degree," vague as it is, would probably be sufficient to raise an issue of fact, despite his otherwise unqualified statements, repeated several times, that he did not rely on Ayerst's warnings as a source of information about Antabuse.[9] We hold, however, that whether Dr. Wylie did or did not read Ayerst's warnings is not a *material* issue of fact. Rather, the crucial issue is whether it would have made any difference to Dr. Wylie if the asserted inadequacy in the warning had been corrected, or whether he would have prescribed Antabuse for Mrs. Mampe anyhow, regardless of what the warning label said. On this point there is clearly no dispute. The uncontroverted evidence shows that Dr. Wylie was aware, and told Mrs. Mampe, that she might die if she drank alcohol while taking Antabuse.[10] He was obviously relying on her not drinking, rather than on any perceived absence of danger in mixing alcohol with Antabuse, in prescribing the drug. Despite the doctor's warnings, however, she drank and suffered the reaction which led to her hospitalization. Given this record, we hold that Mrs. Mampe failed to present sufficient evidence to raise a genuine issue of fact on the issue of causation, and that Ayerst was accordingly entitled to summary judgment.

## IV

One other matter needs to be discussed: the protective order, which prohibits disclosure by Mampe of any document provided by Ayerst during discovery which Ayerst identifies as "confidential," and also requires Mampe to return to Ayerst (or certify as destroyed) all such documents at the conclusion of this litigation. Mampe argues that the trial court erred in granting the protective order without a sufficient showing of good cause by Ayerst. Although she has no present plans to use Ayerst's documents outside of this litigation, she seeks the option of making them, or the information in them, publicly available at a later time. Ayerst answers that the protective order should be sustained because, without an actual plan to use discovered information publicly, Mampe's asserted desire for public disclosure is speculative and premature.

■■■ Super.Ct.Civ.R. 26(c), like its almost identical federal counterpart, Fed.R. Civ.P. 26(c), authorizes the trial court to grant, "for good cause shown, ... any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense...." To prevent abuse of the discovery process, the order may impose specific terms and conditions for discovery and may require that confidential information be disclosed in a certain manner, or not be disclosed at all. A court has substantial discretion in deciding to grant a protective order, and its decision to do so will not

---

**9.** Dr. Wylie's answers to interrogatories, on the other hand, do not raise an issue of fact. They are too weak to permit a trier of fact to find that he read, or even saw, Ayerst's warnings about Antabuse when he consulted the PDR. At most, his answers establish only that he used the PDR as a general reference source in his practice; they do not show that he actually checked Ayerst's information in the PDR when treating Mrs. Mampe. *See Oppenheimer v. Sterling Drug, Inc., supra,* 7 Ohio App.2d at 109, 219 N.E.2d at 58–59 (physician's statement that he consulted the PDR did not show causation when he also testified that he did not recall reading manufacturer's precautions).

**10.** In his answer to Mampe's interrogatory No. 28, Dr. Wylie stated, "I warned Ms. Mampe repeatedly not to drink while on Antabuse, that it would be dangerous to do so and to inform

me immediately if she did." In his answer to interrogatory No. 35, he said that before he first prescribed Antabuse, he "informed the patient as to the risks and alternatives to treatment." More specifically, in responding to interrogatory No. 37, Dr. Wylie said:

> I gave my usual description of Antabuse treatment *along with the usual warnings* ... to the patient several times prior to March 9th when the medication was prescribed.... I reemphasized to her [on April 11, when she was admitted to Sibley Hospital], very specifically, as to the dangers of drinking on Antabuse ... including the risk [of] cardiovascular collapse, respiratory failure, shock, loss of blood pressure, *and death.* On May 4th ... I again reemphasized, in the strongest possible language, the dangers of drinking on Antabuse. [Emphasis added.]

ordinarily be disturbed on appeal unless that discretion has been abused. *See Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 36, 104 S.Ct. 2199, 2209, 81 L.Ed.2d 17 (1984); *Plough, Inc. v. National Academy of Sciences,* 530 A.2d 1152, 1155–1156 (D.C. 1987).

■ Before a protective order may be entered, however, the party seeking it must make a showing of good cause, stating with some specificity how it may be harmed by the disclosure of a particular document or piece of information. *Cipollone v. Liggett Group, Inc.,* 113 F.R.D. 86, 90 (D.N.J.1986), *mandamus denied,* 822 F.2d 335 (3d Cir.), *cert. denied,* — U.S. ——, 108 S.Ct. 487, 98 L.Ed.2d 485 (1987). "The burden then shifts to the party seeking discovery to establish that the disclosure is both relevant and necessary to the action.... To show necessity, the party seeking discovery must demonstrate that the information is necessary to the preparation of its case for trial, including proving its own theories and rebutting those of its opponent." *Plough, Inc. v. National Academy of Sciences, supra,* 530 A.2d at 1155–1156 (citations omitted).

In this case, unfortunately, the trial court did not state on the record its reasons for granting the protective order; consequently, we do not know on what basis the court found good cause. In other circumstances we would probably remand the case for amplification of the record, or perhaps for a stronger showing of either the need for the protective order or the need for disclosure of confidential information,

or both. Given our affirmance of the trial court's judgment on the merits, however, most of the issues relating to the protective order are moot. The only aspect of it that is not moot is the part that restricts the use of discovered documents to this litigation and requires Mampe to return all confidential documents to Ayerst, including all copies that may have been made, when the litigation is over.

■ We agree with Mampe that Ayerst did not make a sufficient showing of good cause under Rule 26(c). It has not shown how it would be harmed or embarrassed by public disclosure of particular documents. "Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test.... Moreover, the harm must be significant, not a mere trifle." *Cipollone v. Liggett Group, Inc.,* 785 F.2d 1108, 1121 (3d Cir.1986) (citations omitted). Ayerst has merely asserted that it should be protected, noting that Mampe's counsel had orally promised earlier in the litigation to limit the use of discovered information. This is not enough to constitute good cause, especially when the protective order is as broad as the one before us here.[11]

■ On the other hand, there are two factors which suggest that, at this stage of the proceedings, all of the documents which have not been made part of the court record (such as exhibits in evidence) should be returned to Ayerst. First, since discovery is intended as an aid to the litigation of a particular case or controversy,[12] there

---

11. The order in this case is what the Third Circuit called an "umbrella order" in *Cipollone v. Liggett Group, Inc., supra,* 785 F.2d at 1122 & n. 18. We agree with the Third Circuit that an umbrella order is appropriate for a case such as this, in which there are large numbers of documents at issue. Upon a threshold showing of good cause by the moving party, the court would enter an order which "would initially protect all documents that the producing party designated in good faith as confidential."

After the documents [are] delivered under this umbrella order, the opposing party could indicate precisely which documents it believed to be not confidential, and the movant would have the burden of proof in justifying the protective order with respect to those doc-

uments. The burden of proof would be at all times on the movant; only the burden of raising the issue with respect to certain documents would shift to the other party.
*Id.* at 1122 (footnote omitted).

12. Super.Ct.Civ.R. 26(b)(1) provides in pertinent part:

Parties may obtain discovery regarding any matter, not privileged, which is *relevant to the subject matter involved in the pending action....* [Emphasis added.]

*See Seattle Times Co. v. Rhinehart, supra,* 467 U.S. at 34, 104 S.Ct. at 2208; *Plough, Inc. v. National Academy of Sciences, supra,* 530 A.2d at 1156 ("the party seeking discovery must demonstrate that the information is necessary to the preparation of its case for trial"); *cf. Clauss v.*

would appear to be no reason for a party to retain documents obtained through discovery after that litigation has ended, especially when the party from whom they were obtained objects to their retention. Second, a litigant does not have "an unrestrained right to disseminate information that has been obtained through pretrial discovery." *Seattle Times Co. v. Rhinehart, supra*, 467 U.S. at 31, 104 S.Ct. at 2206. There is no public right of access to discovery materials that no party has introduced into evidence, appended to pleadings, or otherwise made part of the judicial record. "No court of record has extended the public right of access to ... documents gained through discovery." *Mokhiber v. Davis*, 537 A.2d 1100, 1109 (D.C.1988). Because such materials "are not public components of a civil trial," *Seattle Times Co. v. Rhinehart, supra*, 467 U.S. at 33, 104 S.Ct. at 2207, a court may restrict their disclosure in order to prevent abuse of the discovery process. *Id.* at 34–36, 104 S.Ct. at 2208–2209.[13]

■■■■ Given the inadequacy of Ayerst's showing of good cause, we remand this case to the trial court to determine whether the protective order should be continued. Since Ayerst did not meet its initial burden of showing good cause under Rule 26(c), it must now "demonstrate that disclosure [of its confidential documents not part of the judicial record] might be harmful." *Plough, Inc. v. National Academy of Sciences, supra*, 530 A.2d at 1155 (citations omitted). Its showing must be specific and substantial; vague, conclusory

assertions of the sort previously made by Ayerst will not sustain a protective order. *See Cipollone v. Liggett Group, Inc., supra*, 785 F.2d at 1121.[14] Assuming that Ayerst makes the requisite showing, the burden will then shift to Mampe, who must establish "that the disclosure is both relevant and necessary to the action"—*i.e.*, to *this* action. *Plough, Inc., supra*, 530 A.2d at 1155 (citations omitted). Disclosure for its own sake, or for the benefit of another litigant in another case, probably would not satisfy this requirement. We do not close the door entirely to the possibility that some litigant in some case might be able to show that disclosure to a person not involved in that case would be consistent with *Mokhiber, Plough*, and *Seattle Times*. We think, however, that the prospect is unlikely.[15]

### V

The order granting Ayerst's motion for summary judgment is affirmed on the ground that the uncontroverted evidence fails to establish that the alleged inadequacy, if any, of Ayerst's warning label proximately caused Mrs. Mampe's injuries. The case is remanded to the trial court for further proceedings with respect to the protective order, consistent with part IV of this opinion.

**AFFIRMED IN PART, REMANDED IN PART.**

*Danker*, 264 F.Supp. 246, 249 (S.D.N.Y.1967) (purpose of discovery is "to prepare for trial of the issues, not to uncover assets that might be applied toward satisfaction of a judgment").

**13.** Cases such as *Patterson v. Ford Motor Co.*, 85 F.R.D. 152 (W.D.Tex.1980), on which Mampe relies, are of doubtful value as precedent in the wake of the Supreme Court's decision in *Seattle Times, supra*. *See Tavoulareas v. Washington Post Co.*, 238 U.S.App.D.C. 23, 737 F.2d 1170 (1984) (en banc), *on remand*, 111 F.R.D. 653 (D.D.C.1986).

**14.** If Ayerst had made a sufficient showing of good cause when it first sought the protective order, its burden of justifying continuation of

the order at this stage might not be so great. *See Tavoulareas v. Washington Post Co.*, 111 F.R.D. 653, 659–660 (D.D.C.1986).

**15.** Mampe's challenge to the limitations on discovery imposed by the trial court is without merit. We review such rulings only for abuse of the trial court's broad discretion. *E.g., Plough, Inc. v. National Academy of Sciences, supra*, 530 A.2d at 1156; *In re Multi–Piece Rim Products Liability Litigation*, 209 U.S.App.D.C. 416, 424, 653 F.2d 671, 679 (1981) (trial court "has broad discretion in its resolution of discovery problems"); *Perel v. Vanderford*, 547 F.2d 278, 280 (5th Cir.1977) ("proper standard" of review is abuse of discretion). We find no such abuse here.