Brassard, J.
On December 7, 1999, this matter was before the court on the motion of defendants A.H. Robins Co., Inc. (“Robins”) and Wyeth-Ayerst Laboratories Division of American Home Products Corporation (“Wyeth”) (collectively, “AHP”) for summary judgment on plaintiffs’ counts of negligent failure to warn, breach of express warranty, and violation of G.L.c. 93A, the Massachusetts Consumer Protection statute (“93A”) and G.L.c. 229, §§2, 6 (punitive damages for wrongful death and conscious pain and suffering).
Defendants argue that they had no duty to warn consumers directly of the dangers of taking certain *232 prescription medications, that the adequacy of the warning provided to physicians may not be challenged because the prescribing physician did not read the package insert or consult the Physicians’ Desk Reference (“PDR”)[3] to obtain information about the drug, and that they made no express warranties about the safety or efficacy of their products. Defendants contend, therefore, that any statutory claims will fail for lack of causation. Plaintiffs respond that AHP was required to warn patients directly; that AHP’s warnings to physicians about the dangers of its product, fenfluramine, were inadequate; and that AHP breached express warranties as to the safety and efficacy of its products. Plaintiffs contend that, had AHP provided adequate warnings, Ms. Linnen would not have taken the medication that allegedly resulted in her death.
For the following reasons, the motion is ALLOWED in part and DENIED in part.
BACKGROUND
In April 1996, Mary Linnen (“Ms. Linnen”), who was approximately 50 pounds over her baseline weight, consulted with an endocrinologist, Dr. Abby Landzberg (“Dr. Landzberg”). After examining Ms. Linnen and conducting a series of tests, in May of 1996 Dr. Landzberg prescribed a combination of the anorectic medications fenfluramine and phentermine (“fen-phen”). Fenfluramine is manufactured by AHP.
When a different patient had requested fen-phen in February 1996, Dr. Landzberg attempted to obtain information about the medications. Because she believed the drug was too new to the market to be included in the PDR, she did not consult the PDR or read the package insert for fenfluramine. Instead, she reviewed Internet and newspaper articles provided by the patient. Dr. Landzberg also called a pharmacist at the South Shore Hospital, who informed her that the medications could cause dry mouth, palpitations, and excessive urination, some of the side effects listed in the PDR. In addition, Dr. Landzberg obtained information concerning possible adverse side effects and drug interactions from Dr. George Blackburn (“Dr. Blackburn”) at the Deaconess Hospital in Boston. Dr. Blackburn had published and spoken extensively on the subject of obesity. At the time of Dr. Landzberg’s consultation, Dr. Blackburn had been commissioned to write a “white paper” for the Massachusetts Medical Society on the risks associated with fenfluramine. Dr. Blackburn informed Dr. Landzberg that fen-phen could cause excessive urination, palpitations, dry mouth and diarrhea; and that fen-phen enabled 85% of patients to lose 10% of their body weight. Dr. Blackburn advised Dr. Landzberg to monitor patients at six-week intervals to supervise the safety and efficacy of the medication. Dr. Blackburn had spoken extensively about fen-phen at medical conferences, some of which were sponsored by AHP.
In May 1996, the fenfluramine label contained a statement that “there have been four cases of pulmonary hypertension reported in association with fenfluramine use . . .” In July 1996, approximately two months after Ms. Linnen stopped taking fen-phen, AHP modified the label to include a warning that an epidemiological study (IPPH) had shown a significant association between pulmonary hypertension and patients who took fenfluramine for longer than three months.
Over the Memorial Day weekend, Ms. Linnen experienced shortness of breath while playing golf. On June 5, 1996, she reported her symptoms to a nutritionist at Dr. Landzberg’s office and was directed to stop taking the medication. Ms. Linnen was diagnosed with pulmonary hypertension in November 1996 and died in February 1997.
DISCUSSION
Summary judgment is appropriate where there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. See Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). “A party moving for summary judgment in a case in which the opposing party will have the burden of proof at trial is entitled to summary judgment if he demonstrates . . . that the party opposing the motion has no reasonable expectation of proving an essential element of that party’s claim.” Id. at 714. See Dalloff v. School Committee of Methuen, 9 Mass.App.Ct. 502, 505 (1980). This motion raises the following issues: 1) whether AHP had a direct duty to warn Ms. Linnen and other consumers about risks associated with fenfluramine, 2) whether AHP provided the medical community with adequate warnings about such risks, and 3) whether a different result would have occurred if AHP had provided a more timely warning about the risks of fenfluramine.
Learned Intermediary Rule
Ordinarily, a manufacturer of a product with known dangers has a duty to warn consumers who will come in contact with, and thus maybe endangered by that product. H.P. Hood & Sons v. Ford Motor Co., 370 Mass. 69, 75 (1976). Where, however, it is unreasonable to expect the manufacturer to communicate directly with the consumer, the “manufacturer maybe absolved from blame because of justified reliance upon ... a middleman.” See MacDonald v. Ortho Pharmaceutical Corp., 394 Mass. 131, 135 (1985). Under this “learned intermediary” rule, a drug manufacturer’s duty to warn is generally discharged by providing physicians with an adequate warning about any risks associated with its prescription drug products. It then becomes the duty of the physician to warn the patient of risks associated with the drug. Id. at 136, quoting (1985), quoting McEwen v. Ortho Pharmaceutical Corp., 270 Or. 375, 386-87 (1974) (“duty of the ethical drug manufacturer is to warn the doctor, rather than the patient, [although] the manufacturer is directly *233 liable to the patient for a breach of such duty . . .”). The rationale for the rule is that “the prescribing physician, as the ‘learned intermediary’ standing between the manufacturer and the consumer/patient, is generally in the best position to evaluate the potential risks and benefits of ingesting a certain drug and to advise the patient accordingly.” See Garside v. Osco Drug, Inc., 976 F.2d 77, 80 (1st Cir. 1992) (applying Massachusetts law).
In MacDonald, the Supreme Judicial Court created a narrow exception to the learned intermediary rule, holding that a manufacturer of oral contraceptives was “not justified in relying on warnings to the medical profession to satisfy its common law duty to warn,” but also had a duty to warn the ultimate user. Id. at 138. The Court held that oral contraceptives had sufficient “peculiar characteristics” to warrant the imposition of a common law duty to warn the consumer directly. The Court noted several factors setting birth control pills apart from other prescription drugs, including a more active role by the patient, a more passive role by the doctor, and less medical supervision than was provided with other prescription drugs. Finally, the Court found significant an FDA regulation which required that manufacturers of birth control pills warn consumers directly. Id.
Massachusetts has not extended this narrow duty to warn consumers directly, even for manufacturers of other forms of birth control. See Raimer v. Searle, Civil Action No. 870248 (Berkshire Superior Court, Jan. 31, 1990) (Urbano, J.) (no duty to warn consumer about risks of IUD where physician played an active role and no federal regulations required manufacturer to warn consumer directly).
Plaintiffs argue, however, that the peculiar characteristics of oral contraceptives also apply to anorectic drugs because the typical consumer is a young, healthy woman; the patient plays an active role in the decision to take the drug; and the level of medical supervision is limited. Plaintiffs base these alleged similarities primarily on their assertions that during the “fen-phen craze,” diet pills were available in “pill mills” operated by nurses with limited medical supervision, and were easily available over the telephone and the internet.
Although plaintiffs argue that many of the conditions in McDonald apply with equal force to diet pills, that view is not supported by the facts of this case. Ms. Linnen consulted with Dr. Landzberg to obtain medical assistance with a weight problem; she did not go seeking diet pills. Dr. Landzberg conducted a physical examination of Ms. Linnen and ordered several tests to try to determine the cause of Ms. Linnen’s weight gain. It was only when the tests came back negative that Dr. Landzberg recommended fen-phen. Moreover, in contrast to the usual birth control pill scenario, in which the patient receives a prescription for six months or a year with no further interaction with the physician, Dr. Landzberg gave Ms. Linnen only a six-week prescription.[4] When Ms. Linnen reported a few weeks later that she was experiencing shortness of breath, she was instructed to stop taking the pills. Finally, unlike oral contraceptives, there was no FDA requirement that AHP provide consumers with written information about fenfluramine. MacDonald at 138.
After careful review of the submissions of the parties, the court finds no evidence that Dr. Landzberg’s prescription of fen-phen for Ms. Linnen constituted anything other than an ordinary medical interaction between a doctor and patient. Consequently, under the learned intermediary rule, AHP had no duty to warn Ms. Linnen directly about the risks associated with diet pills. See MacDonald v. Ortho, supra.
Adequacy of Warning to Physicians/Causation
AHP did, however, have a duty to provide physicians with adequate warnings about non-obvious risks of fenfluramine of which AHP knew or should have known. See MacDonald at 136; Garside at-81. Plaintiffs argue that in May of 1996 AHP was aware that the IPPH epidemiological study had found a significant association between the ingestion of fenfluramine and the development of pulmonary hypertension, and that AHP had a duty to warn physicians about the results of the study.[5] Dr. Landzberg has testified that she altered her prescribing practices when she became aware of the reported association between fenfluram-ine and pulmonary hypertension. She no longer volunteered fen-phen to patients, and provided patients with specific warnings about the risk of developing pulmonary hypertension.
AHP argues, however, that the adequacy of the warning is irrelevant in this case because Dr. Landzberg acknowledges that she did not consult the PDR or read the package insert before prescribing fen-phen for Ms. Linnen. “Where the manufacturer fails to provide the physician with an adequate warning, the manufacturer may still be shielded from liability if it can show that the prescribing physician would not have heeded an adequate warning.” See Garside at 80 and cases cited. AHP contends, therefore, that the alleged inadequacy of the warning is irrelevant because Dr. Landzberg’s failure to read the package insert or PDR would have made any such warning futile. Id. at 81. There is evidence, however, that Dr. Landzberg did seek information about fen-phen from a pharmacist and from an expert in pulmonary hypertension. Both of those persons may have relied at least in part on the information contained in the package insert and the PDR. Plaintiffs urge that had the fenfluramine insert been altered to include the results of the IPPH interim study prior to May 1996, or had AHP provided the medical community with a timely warning that fenfluramine significantly increased the risk of developing pulmonary hypertension, the pharmacist and physician contacted by Dr. Landzberg would have warned her about the risk.
*234 Plaintiffs contend that it may be inferred or even presumed that Dr. Landzberg would have heeded an earlier warning about the association between fenfluramine and the development of pulmonary hypertension. Garfield, at 80. Defendants respond that there is no way to know whether the pharmacist or Dr. Blackburn obtained the information they communicated to Dr. Landzberg from the PDR, or whether they would have given her different advice had they been aware of the interim results of the IPPH study. That, however, is a question of fact for a jury. See MacDonald at 141 (fact finder may find a warning to be inadequate in its factual content, its expression of the facts, or because of the method or form in which it is conveyed). “A warning may be found to be unreasonable in that it was unduly delayed, reluctant in tone, or lacking in a sense of urgency.” Id., quoting Seley v. G.D. Searle Co., 67 Ohio St.2d 192, 198 (1981).
In addition to the factual issue about the adequacy of the warnings, there is also a factual issue as to whether any inadequacy of the warning caused Ms. Linnen harm. Assuming that the warning was inadequate, defendants have failed to establish that Dr. Landzberg’s decision to prescribe fen-phen “would not have been affected... by communication of an adequate warning” to the medical community. See Mampe v. Ayerst Labs, 548 A.2d 798, 799 (D.C.App. 1988). Where there is a material issue of fact as to the adequacy of AHP’s warnings to physicians in May of 1996, and as to whether any alleged inadequacy resulted in harm to Ms. Linnen, summary judgment is not appropriate.
Breach of Express Warranty
Defendants also seek summary judgment on plaintiffs’ claim that AHP breached express warranties as to the safety and effectiveness of fenfluramine. A claim for breach of express warranty requires proof that the defendant promised the plaintiff a specific result that was not achieved. See Anthony’s Pier Four v. Crandall Dry Dock Engineers, 396 Mass. 818, 823 (1986). AHP argues that because it had no direct contact with Ms. Linnen, and Dr. Landzberg did not rely on AHP’s package insert or the PDR in prescribing fen-phen, plaintiffs are unable to identify any specific communication in which AHP made specific promises to Ms. Linnen about the safety or efficacy of fenfluramine.
Plaintiffs argue that in a telephone conversation with Dr. Landzberg, Dr. Blackburn made certain representations about the risks and benefits of fenfluram-ine, and that those representations constituted an express promise. In that conversation, Dr. Blackburn reportedly stated that fen-phen could cause excessive urination, palpitations, dry mouth and diarrhea; and that fen/phen enabled 85% of people to lose 10% of their body weight. Dr. Blackburn advised Dr. Landzberg to monitor Ms. Linnen at six-week intervals to supervise the safety and effectiveness of the medication. Dr. Blackburn stated that he could not remember a specific conversation with Dr. Landzberg, but that he was often contacted by physicians with questions about anorectic drugs.
Plaintiffs contend that Dr. Blackburn’s statements were sufficiently factual to constitute an express warranty, that Dr. Landzberg relied on Dr. Blackburn’s statements about the risks and benefits of fen/phen, and that Dr. Blackburn was acting as an agent of AHP at the time he made the statements. Plaintiffs base their claim of agency on their assertion that Dr. Blackburn spoke at some conferences sponsored by AHP. The parties closely contest whether Dr. Blackburn, if he made any statement to Dr. Landzberg, did so with the authority to speak for AHP. See Patenaude v. Anderson, 40 Mass. App. Dec. 198, 201 (1968) (car dealer could not be held to be acting as agent for manufacturer absent some authority from the manufacturer). The alleged relationship between Dr. Blackburn and AHP raises enough of a factual issue to survive a motion for summary judgment.
Statutory Claims
Defendants also seek summary judgment on plaintiffs’ claims for violation of c. 93A and G.L.c. 229, §§2, 6 (punitive damages for wrongful death and conscious pain and suffering). Defendants argue that they are entitled to judgment as a matter of law because these statutory claims require proof of causation and, based on the current motion, plaintiffs will be unable to establish that any wrongful conduct by AHP was the proximate cause of Ms. Linnen’s death.
Because AHP is not entitled to summary judgment either as to the adequacy of its warning to physicians or as to whether any inadequacy caused harm to Ms. Linnen, AHP is not entitled to summary judgment on its statutory claims.
ORDER
For the following reasons, it is hereby ORDERED that AHP’s motion for summary judgment is DENIED, except as to failure to warn Ms. Linnen directly.

The Physicians’ Desk Reference is a compendium of manufacturer information for all prescription drugs, including the information contained in package inserts.

In MacDonald, in contrast, the Court found that MacDonald saw her gynecologist yearly, in the summers of 1973 and 1974, and in August 1975. At each appointment, she received a prescription for birth control pills. Thus, eleven months had elapsed between her last gynecological checkup and her stroke in July 1976. See MacDonald at 137, fn. 11.

 Although the results of the study were first made public in July 1996 and were published in the New England Journal of Medicine in August 1996, plaintiffs allege that AHP received a copy of the interim IPPH report in March 1995. The interim report indicated an association between fenfluramine and PPH.