Kevin WORD, et al., Appellants,

v.

POTOMAC ELECTRIC POWER COMPANY, Appellee.

No. 97–CV–1402.

District of Columbia Court of Appeals.

Argued May 11, 1999.

Decided Dec. 9, 1999.

Kenneth Shepherd, Washington, DC, for appellants.

Martin H. Freeman and Mark A. Freeman, with whom Robert K. Jenner, Rockville, MD, was on the brief, for appellee.

Before STEADMAN and RUIZ, Associate Judges, and MACK, Senior Judge.

STEADMAN, Associate Judge.

Kevin Word [1] brought suit alleging negligence and strict liability against Potomac Electric Power Company ("PEPCO") for injuries suffered during an electrical explosion.[2] The trial court granted a directed

---

1. Diane Word joined the action seeking loss of consortium damages. For convenience, the opinion will refer to both appellants collectively as "Word."

2. The original complaint also included claims for breach of warranty for fitness, negligent design, and failure to warn design defect. These claims were dismissed prior to jury deliberations and are not material to this appeal. Pretrial, Word also moved to add a claim against PEPCO for failure to provide a safe workplace in violation of the Industrial Safety Act, D.C.Code § 36–228(a) (1997), and the court granted this motion. The jury found for PEPCO on this claim, and Word does not appeal this part of the verdict.

verdict for PEPCO on the strict liability claim at the close of plaintiff's case, and the jury returned a verdict for PEPCO on the negligence claim, indicating through special interrogatories that it did not find PEPCO to be negligent. We affirm the directed verdict on the strict liability claim. However, we conclude that the trial court erred in striking testimony of plaintiff's expert witness that PEPCO had violated an applicable industry standard and that a new trial is therefore required on the negligence claim.

## I.

### A.

Kevin Word was employed as an electrical mechanic by the Washington Area Metropolitan Transit Authority ("WMATA") when he was injured on the job as a result of an electrical explosion at the Anacostia Metro subway station's south vault room. The south vault room is a point of delivery for high voltage electricity sold by PEPCO to WMATA. This WMATA vault room contains electrical switchgear, which takes high voltage power from the utility, PEPCO, and transforms it to a lower working voltage and distributes electrical power through circuits to provide energy throughout the WMATA metro station building. The switchgear assembly is a series of connected cabinets or cubicles that house fuses, switches, transformers, and other electrical equipment. The first of these cubicles is the "incoming feeder cubicle," which accepts PEPCO's high voltage lines. These lines enter into the top of the incoming feeder cubicle and are connected to equipment therein. As they enter the feeder cubicle the 13,000–volt lines are "stepped down" to 480 volts or less through transformers located in the adjoining cubicles. WMATA disperses the energy at this lower voltage to different circuits used to operate the metro station.

A PEPCO project engineer, Michael Maxwell, testified that PEPCO played no role in the construction or design of the vault room and that WMATA owns the switchgear assembly including the incoming feeder cubicle into which the PEPCO lines feed.[3] During the construction of vault rooms, it was PEPCO policy to place locks on the incoming feeder cubicles to prevent construction workers from inadvertently entering a feeder cubicle and touching energized parts; however, after construction, testing, and inspection was completed, PEPCO's policy was to remove the locks. There was testimony from other witnesses that there was no lock on the incoming feeder cubicle in the south vault of the Anacostia station at the time of the explosion and that PEPCO had in fact removed the temporary construction lock from the cubicle.

On the day of the explosion, Word was called to the vault room with his supervisor and partner, Roger Fowler, to troubleshoot a problem. They were examining the electrical equipment in the vault. The door to the incoming feeder cubicle housing PEPCO's incoming feeder line was open, blocking the passageway as Word approached, holding a hand-held volt meter rated for 750 or 1,000 volts in one hand and a flashlight in the other. Word testified that as he reached to close the door the equipment inside exploded, engulfing him in a super-heated fireball and burning him severely.

### B.

Word's primary contention at trial was that the standard of care required PEPCO to keep the incoming feeder cubicle locked and secure and accessible only to designated personnel and that PEPCO was negligent in failing to keep the incoming feeder cubicle locked and in removing its temporary construction lock. Word also contended that PEPCO was liable for not maintaining a safe workplace for him un-

3. Maxwell testified that the only equipment that PEPCO owns within the switchgear assembly is the transformers that meter the electricity for billing.

der the Industrial Safety Act and that PEPCO was strictly liable in tort as a seller of electrical voltage or current which was defective and unreasonably dangerous and caused Word's injuries.

PEPCO's primary defenses were that PEPCO had no duty to lock the incoming feeder cubicle under industry standards and that Word himself caused the explosion and his injuries by trying to test a 13,000 high voltage line with a low-rated voltage meter. Further, PEPCO maintained that Word did not advance any evidence to explain how the explosion occurred. PEPCO witnesses testified that an "arc" explosion occurred in this case, and that for such an explosion to occur, something would have had to touch the energized equipment in the cubicle or the lead to the volt meter that Word was holding would have had to be brought within ¼ inch of the energized equipment.

Following the conclusion of Word's case, PEPCO moved for a directed verdict on the product liability claim. The trial court granted the motion, concluding that there had been no showing of product defect. The jury returned a verdict for PEPCO on the negligence and Industrial Safety Act claims. Special interrogatories indicated that the verdict on the negligence claim was based on the jury's finding that PEPCO was not negligent.[4]

## II.

In setting forth PEPCO's duties and, arguably, the standard of care for the negligence claim, the parties focused on two industry codes that are potentially applicable to this situation. One is the National Electrical Safety Code (NESC) and the other is the National Electrical Code (NEC). PEPCO's expert, Allen Clapp, testified that the NESC applies to power utilities such as PEPCO and that the NEC did not apply here. Word's expert, Wallace O. Faison, was of the view that, although the NESC is primarily applicable to utilities, the NEC applies to utilities when they go into buildings in certain circumstances, and that the NEC was the applicable code in this case, not the NESC.

Both experts, however, acknowledged that the two codes had essentially the same requirements with regard to locking the type of energized equipment involved in the context of this case. Their disagreement was in what was required, in particular whether PEPCO was responsible for securing the area and whether the incoming feeder cubicle itself was required to be locked as opposed to the outer vault.[5] PEPCO's expert, Clapp, contended that the standard required the vault itself to be locked and access limited to authorized and qualified personnel,[6] but that the incoming feeder cubicle itself need not be locked but only secured, for example by a latch, so that the door would not fly open. Word's expert, Faison, took the position that PEPCO was required to keep the incoming feeder cubicle locked.

> *Exception: Where such entrances are under the observation of a qualified person at all times.*
> Where the voltage exceeds 600 volts, nominal, permanent and conspicuous warning signs shall be provided, reading substantially as follows: "Warning–High Voltage–Keep Out."

Other subsections of NEC 110–34 deal with design defects, such as working space, separation from low voltage equipment, illumination, and elevations.

---

**4.** Following the special interrogatory instructions, because the jury concluded that PEPCO was not negligent, it did not reach the issue of contributory negligence or loss of consortium. *Cf. Massengale v. Pitts*, 737 A.2d 1029 (D.C. 1999).

**5.** In their briefs, neither party focuses upon the precise language of either the NESC or the NEC or provides excerpts from or detailed citations to the relevant sections. A 1990 version of the NEC 110–34 provides:
    (c) Locked Rooms or Enclosures. The entrances to all buildings, rooms, or enclosures containing exposed energized parts or exposed conductors operating at over 600 volts, nominal, shall be kept locked.

**6.** He also testified that Kevin Word fit within this categorization.

A key issue on appeal is whether the trial court erred in its ruling, some two weeks after the close of Faison's appearance, that Faison's testimony that PEPCO had violated the locking requirements of NEC 110–34 should be stricken. The trial court did so in the belief that plaintiff's counsel had asserted during the course of Faison's testimony that Faison would not be asserting any violation of NEC 110–34 and thus had waived any right to make that argument. To understand the problem in this regard, it is necessary to examine the trial proceedings during the course of Faison's testimony.

Because of scheduling problems, PEPCO's expert on industry standards, Clapp, testified first, during the course of the plaintiff's case, and stressed the applicability of the NESC. Subsequently Faison testified for the plaintiff. Word's counsel had made clear during Faison's testimony that he was seeking to prove a violation of the NEC as part of the case, stating early on in the testimony that "[t]he witness's testimony today will be ... that there were violations of the National Electric Code" and "[the expert's] testimony will be that the NEC was violated." Subsequently, when PEPCO's counsel began objecting to Faison's testimony arguing that he should not be permitted to testify regarding violations of the NESC, Word's counsel asked what all the fuss was about because the thrust of his expert's testimony was not that the NESC was violated. The court stated: "He's going to testify, I guess, that the NEC was violated." Word's counsel responded "Correct," and then PEPCO's counsel stated: "If that's his testimony he can say that and I can cross him."

However, subsequently, PEPCO's counsel made a series of objections to questions put to Faison about NEC 110–34, arguing that Word's counsel was trying to show improper design of the feeder cubicle even though he had previously represented to the court that he was not attempting to do

so. Word's counsel responded that he wanted to have his expert discuss the design but that he was not trying to show a design violation; rather he was attempting to show a violation in the use of the design by conduct in not locking and preventing access to the cubicle while energized, saying:

> It's a proper design for nonenergized access, but it excludes energized access. It's a proper design for nonenergized access and where that design is used, energized access must be prohibited by locks and barriers and keys.

Subsequently, PEPCO's counsel continued his argument that Word was arguing a design defect, asserting that "you're talking about under the situations that existed here it's an improper design and that's exactly what you represented that you weren't going to do." In response, Word's counsel reiterated:

> As I said in my opening statement, this is a proper design. This design intends limited access. This design intends that this cubicle be deenergized and that this very elaborate safety procedure be gone through before anybody goes to that cubicle.

Finally, after a brief further discussion of the design issue, this exchange occurred:

> Mr. Jenner [PEPCO's counsel]: My question to the court is yes or no is he going to say there was a violation of 110–34?
>
> Mr. Shepard [Word's counsel]: No, no violation.
>
> Mr. Jenner: That's the representation to the court.

It was Mr. Shepard's representation of "[n]o, no violation" that formed the basis of the court's decision more than two weeks later[7] to strike the opinion of expert Faison that NEC 110–34 was violated on the ground that Mr. Shepard represented to the court that Faison would not testify that section 110–34 was violated. The

---

7. The trial had been interrupted by a long-scheduled vacation of the trial court judge.

court's determination was made based on a partial transcript and memory. Word's counsel implored the court to read the broader transcript of the May 6, 1997 testimony of Mr. Faison, arguing that read in context his statement "no, no violation" meant only that Faison was not going to testify that there was a design violation. The court declined to review the broader transcript.[8] After examining the full transcript of the trial proceedings during the course of Faison's testimony, as set forth above, we are compelled to agree with Word that, in context, his counsel's waiver must be read to extend only to a representation that his expert would not be testifying to a design violation of NEC 110–34 and indeed was consistent with the trial court's own understanding at the time of the asserted waiver.

After the "no, no violation" representation Word's counsel then continued to question his expert about section 110–34 of the NEC, without complaint by the court.

Mr. Shepard: ... Now we agree that this is a proper and appropriate design under the National Electrical Code. Is that correct?

Mr. Faison: That's correct, sir.

The expert then provided testimony that the design intends access to the cubicle only after it is de-energized by PEPCO. He further testified that, assuming a lock was on the feeder cubicle at the time of installation, and then was later taken off by PEPCO personnel without seeking the consent of or advising WMATA that they were doing so, this would not comply with minimum acceptable safety practices for utilities.

Mr. Faison: In my opinion that does not comply with accepted or minimum safety standards.

. . .

The reasoning is that you have degraded ... an acceptable level of safety. In

this case by degrading, by taking locks off you have made these cabinets accessible to nonqualified ... Pepco employees and, therefore, you have violated the intentions of the codes that we were talking about, which is 110–34.

PEPCO's counsel again objected:

Mr. Jenner: The legal double-talk is for an opinion by this expert that 110–34 is violated. A moment ago there was a representation to this court made by Mr. Shepard that there would be no testimony that 110–34 was violated and now we hear from this witness that 110–34 was violated.

The court's response to this objection indicates that, at the time, the court also understood Mr. Shepard's words "no, no violation" to mean that his expert was not going to testify that there was a design violation, not that he was not going to testify as to any violation of 110–34.

The Court: What he was talking about a minute ago was in reference to—what we talked about a while ago was he was saying that ... he was not going to say 110–34 was violated by the design of the room, the 37.4 inches or whatever. What we are talking about now was not the inches from the wall but talking about locks on the door and that's what [Faison] just got through talking about, locks on the door, if they went out there and took locks off these doors that would not be in compliance. That's what he just said.

This view of the waiver as more limited is also consistent with Word's theory of the case, which was not a design defect but rather that the incoming feeder cubicle was not locked the way it was supposed to be and that access was not restricted to designated representatives. Further, a complete waiver of testimony by Faison that the NEC was violated would have been totally inconsistent with the earlier explicit statements by Word's counsel that

8. Specifically, the court said: "I'm not about to halt this trial to go back and order and look

at any more transcripts."

he intended to prove a violation of the NEC and indeed with Word's whole theory of the case.

The court instructed the jury that it was "striking the opinion of Wallace Faison that the National Electric Code section 110[-]34 was violated.... But you may still consider his explanations of the meaning of 110–34 along with the ... explanations and opinions of the other experts and determine, based upon all of the evidence ... whether 110[-]34 was violated." This was a distinction without a difference in the context of this case. Faison was Word's only expert, and the thrust of plaintiff's case was that NEC section 110–34 in effect established the standard of care and that PEPCO's failure to keep the feeder cubicles locked violated the NEC and thus the standard of care. Striking Faison's opinion that the NEC was violated right before the jury began deliberations significantly gutted Faison's crucial testimony and left Word with no expert testimony to counteract PEPCO's expert's assertion that PEPCO had not violated the standard of care.[9]

The adverse effect of the ruling striking Faison's testimony that PEPCO had violated industry standards was exacerbated by the effect of a related trial court ruling, although that ruling was not necessarily erroneous in itself. As already described above, Clapp, PEPCO's expert on the industry standard, had testified first about the applicability of and nonviolation of the NESC. Clapp testified that NESC standards applied in this case and also that the NEC and the NESC standards in essence required the same thing with respect to locking energized equipment. When Word's counsel subsequently sought to introduce testimony by Faison relating to PEPCO's violation of the NESC, PEPCO objected on the ground that it would be "sandbagged" by such testimony because Faison had testified in his deposition that

he was not going to testify that the NESC was violated. Word argued that, while the thrust of Faison's testimony would be that the NEC was applicable and was violated, Faison would also be saying that, as testified to by Clapp, the two codes require the same thing with respect to locking and if one was violated so was the other.[10]

> Mr. Shepard: The witness is not going to testify that the NESC was principally violated. His testimony will be that the NEC was violated. However, we're in the context of a trial. This man's witness, Mr. Jenner's witness, his own expert, has testified that both codes require the same thing.

In an apparent attempt to avoid making a ruling on whether to exclude Faison's testimony on the NESC bases on PEPCO's sandbagging argument, the court focused on the representations of Word's counsel that Faison "[was] not going to testify that [PEPCO] violated the NESC anyway," and asked for clarification:

> The Court: Wait, let me just clear it. Is he going to say that the National Electrical Safety Code was violated and your answer is no, right?
>
> Mr. Shepard: No.

The Court attempted to clarify again:

> The Court: ... [Mr. Jenner's] motion, Mr. Shepard, was to have me impose some sort of sanction, perhaps not having this witness testify at all, because his claim is that he's sandbagged if this man is going to testify that the National Electrical Safety Code was violated.
>
> If he's not going to say [the NESC] was violated then we don't have to talk about sandbagging. It's moot, if he's not going to say that. All I want is a straight answer do you plan to have him say that on the witness stand?

---

9. No argument is made that it was improper for either expert to express an opinion not only as to the meaning of the code provisions but also whether PEPCO's actions were in violation thereof.

10. Although instructed not to testify that the NESC was violated, Faison later testified that the two codes are complementary.

Mr. Shepard: I don't expect his testimony will be that that [sic] the National Electrical Safety Code—

The Court: It's not enough just to say I don't expect his testimony to be. Then what I want you to do is advise him before he gets up here on the witness stand, out of the presence of the jury that he does not say that. I don't want him to say it and then you say, oh, judge, I didn't realize he was going to say that and I don't want that to happen. So when you tell me you don't expect him to say that, tell him not to say that, okay?

The matter was then dropped with Word's counsel following the court's instruction.

The representations of Word's counsel that Faison was not going to testify that the NESC was violated should be read in the context of his position that it was the NEC that was the applicable code. It was reasonable to expect that Faison would have testified along the lines that even if the NESC applies, as Clapp claimed, it too was violated because the two codes required essentially the same thing, as both experts testified. As it was, plaintiff was deprived of an added opportunity to clarify the interrelation between the testimony of his expert and that of PEPCO.

■ Given the totality of circumstances here, having concluded that the trial court misconstrued the scope of the waiver by Word's attorney and that striking the opinion of Word's expert could have had a

significant effect on the outcome, we must reverse and remand the case for a new trial on the negligence claim.

### III.

Word's other principal claim relevant to this appeal [11] is that the trial court erred in granting a directed verdict for PEPCO on the strict liability claim.[12] Word argues that the court erred because there was sufficient evidence on every element of the product liability claim for the claim to be submitted to the jury. The trial court granted the motion for a directed verdict based on its conclusion that Word had failed to put on any evidence that PEPCO's product, high voltage electricity, was defective.[13]

■ This court has recognized the principles of strict liability in tort set forth in RESTATEMENT (SECOND) OF TORTS § 402A (1965). *See, e.g., Warner Fruehauf Trailer Co. v. Boston,* 654 A.2d 1272, 1274 (D.C. 1995); *Payne v. Soft Sheen Products, Inc.,* 486 A.2d 712, 720 n. 6 (D.C.1985); *Berman v. Watergate West, Inc.,* 391 A.2d 1351, 1356–57 (D.C.1978). To prevail on a claim for strict liability in tort under § 402A, the plaintiff must prove that: "(1) the seller was engaged in the business of selling the product that caused the harm; (2) the product was sold in a defective condition unreasonably dangerous to the consumer or user; (3) the product was one which the seller expected to and did reach the plaintiff consumer or user without any substan-

---

11. Appellant also challenges certain rulings relating to hearsay reports relied on in part by PEPCO's experts. They were relevant only to the issue of possible contributory negligence by Word, an issue the jury did not reach and may not again on retrial. The issues involve discretionary trial court decisions dependent on specific trial context in the field of expert testimony, FED. R. EVID. 703, and prejudicial/probative weighing. *See In re Melton,* 597 A.2d 892 (D.C.1991) (en banc). Given our disposition of this appeal and the uncertainty of the course of events that another trial may take, we do not address these challenges here.

12. Word also argues that because Judge Milliken earlier denied PEPCO's motion for summary judgment on this claim, the "law of the case" doctrine barred Judge Bowers from subsequently granting a directed verdict to PEPCO on the same claim. This argument is foreclosed by our decision in *Gordon v. Raven Systems & Research, Inc.,* 462 A.2d 10, 12–13 (D.C.1983).

13. Although there was some discussion at oral argument regarding the adequacy of warnings on the cubicle, this is not at issue on appeal as Word dismissed the failure to warn claim before the case was submitted to the jury.

tial change from the condition in which it was sold; and (4) the defect was a direct and proximate cause of the plaintiffs injuries." *Warner Fruehauf Trailer Co.*, 654 A.2d at 1274.

■ Until now, this court has not had occasion to review a product liability case involving electricity and thus has not as yet determined whether and when electricity constitutes a "product" for the purpose of strict liability.[14] We need not reach that issue in this case, however. Even assuming arguendo that electricity is a product, we agree with the trial court that Word failed to produce any evidence that PEPCO's high voltage electricity was itself defective.[15] In the absence of any evidence on this essential element of a strict liability case, the court properly granted a directed verdict for PEPCO.

For the foregoing reasons, we reverse and remand for a new trial on the negligence and loss of consortium claims consistent with this opinion and affirm the trial court's directed verdict as to the strict liability claim.

*So ordered.*

---

14. The weight of authority supports extending strict liability to the sale of electricity by utilities. Electricity is considered to be a product in the "stream of commerce" subject to strict liability once it is made available to customers, usually when it passes through the customer's meter. *See* RESTATEMENT (THIRD) OF TORTS: PRODUCT LIABILITY § 19 (1998) (citing cases).

15. None of the testimony of Word's expert appears to have been directed toward the strict liability elements. For example, there was no evidence that PEPCO's power lines delivered electricity exceeding the voltage expected by the consumer to such an extent so as to render WMATA's normal and reasonable

safety precautions ineffective. *See, e.g., Bryant v. Tri–County Elec. Membership Corp.*, 844 F.Supp. 347, 350 (W.D.Ky.1994) (explaining "defective" and "unreasonably dangerous" in context of electricity). Word's theory appears to be that PEPCO is strictly liable on the ground that its failure to lock the incoming feeder cubicle rendered its high voltage electricity defective and unreasonably dangerous; however, in strict liability cases, "the focus is on the product itself (i.e., whether the product as designed was reasonably safe in light of the risks, costs, and benefits) and not on … conduct." *Warner Fruehauf Trailer Co., supra*, 654 A.2d at 1277 n. 13.